UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF IOWA

CENTRAL DIVISION

| | |
|---|---|
| BRIAN SEIM,<br><br>      Plaintiff,<br><br>vs.<br><br>THREE EAGLES COMMUNICATIONS, INC.,<br><br>      Defendant. | No. C09-3071-DEO<br><br>**PLAINTIFF'S BRIEF<br>IN SUPPORT OF RESISTANCE TO<br>MOTION FOR SUMMARY JUDGMENT** |

TABLE OF CONTENTS                                                              PAGE

1. REASONABLE ACCOMODATION                                                     1

2. SEXUAL HARASSMENT                                                           7

3. HOSTILE WORKPLACE                                                          13

4. RETALIATION                                                                16

CONCLUSION                                                                    20

### 1. REASONABLE ACCOMODATION

Plaintiff, Brian Seim, makes a claim of discrimination (denial of reasonable accommodation) under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* and the Iowa Civil Rights Act, § 216.6 Code of Iowa (2011). These statutes protect persons with disabilities against employment discrimination and places obligations upon employers to accommodate disabilities. Over the years the courts had limited the employee's ability to enforce the act. In response, congress passed the ADA Amendments Act of 2008 to restore the broad scope of protections afforded to disabled persons.

This reasonable accommodation claim under the ADA and § 216.6 has six elements:

**1**

1. The plaintiff had impairments: Graves' disease, endocrine and circulatory disorders and related side effects from the medications needed to control his conditions are impairments; and

2. the impairments substantially limited the plaintiff's ability in one or more major life activities; and

3. the defendant knew of the plaintiff's impairments; and

4. the plaintiff could have performed the essential functions of the jobs or positions he sought at the time the defendant denied the change in position or work schedule; and

5. permitting plaintiff to transfer to another position that started later in the day or modifying his work schedule would have been reasonable; and

6. the defendant failed to allow plaintiff to transfer to another job or to change his work schedule so that he could start work later in the day when his symptoms were controlled and he was not suffering the side effects caused by his medication and defendant failed to provide any other reasonable accommodation.

Brian Seim suffers from Graves' disease, a form of hyperthyroidism. It is an autoimmune disease in which the immune system attacks the thyroid gland. The thyroid gland is part of the endocrine system, thus the disease can involve virtually every system in the body. Brian's condition had been treated with radiation therapy that essentially destroyed his thyroid gland. Medication is required to replace the thyroid's hormones and to treat the other conditions caused by the disease. The medication allows him to function. The combination of the medications and the underlying disease impair his sleep, vision, speech, concentration and thinking. His condition caused him to gain weight and to develop enlarged breasts, vision difficulties, insomnia, hypertension, anxiety and narcolepsy. His condition limits his ability to stand for any length of time. It is very difficult for him to work early in the mornings. He must take his medications at the start of the day and their side effects impair his speech and concentration in the morning, making it difficult for him to work early in the day until the side effects wear off.

Under the ADA, a "disability" is defined as "(A) a physical or mental impairment that

substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). This definition "shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." 42 U.S.C. § 12102(4)(A). The amended ADA defines "major life activities" as including, but not limited to, sleeping, standing, speaking, concentrating, thinking, communicating and working. 42 U.S.C. § 12102(2)(A). A "major life activity" also includes the operation of a major bodily function, including but not limited to, functions of the immune system, circulatory and endocrine functions. 42 U.S.C. § 12102(2)(B).

Brian Seim's Graves' disease and the side effects of his medication are an impairment within the context of the ADA because they substantially limit one or more major life activities - sleeping, standing, speaking, concentrating, thinking, communicating, working and the functions of the immune, circulatory and endocrine systems. 42 U.S.C. §§ 12102(2)(B) & 12102(4)(C). An impairment that is episodic or in remission is still a disability if it would substantially limit a major life activity when active. 42 U.S.C. §12102(4)(D). The ADA specifically requires that the determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures.

Three Eagles Communications, Inc. had knowledge of Brian's disability. During his interview for employment he disclosed his disease to Joe Zimmerman. (October 10, 2008) He also discussed it with Duane Murley who was his immediate supervisor after Zimmerman left. Brian needed time off for doctor appointments and tests and needed to explain his medical condition as the reason for the time off. In late December of 2008 he met with the new operations manager, Myles Riker, and explained his disease as an autoimmune blood disorder. Riker asked if it was AIDS, an inappropriate inquiry. Seim said, "No", and Riker raised the

"Gay" issue, another inappropriate comment.

Brian Seim had informed his employer that he could not stand for over ten minutes. The radio booths were stand-up booths. Brian requested a chair but none was provided. Eventually a co-worker loaned Brian his chair.

Brian was assigned an early morning schedule. He repeatedly requested a transfer to a work schedule starting later in the day. He applied for at least five positions that would have allowed him to work later in the day. Every request was denied. He even offered to move, at his own expense, to another Three Eagles' station in another community. While Three Eagles argues that there were valid reasons for denying a change in position or schedule, the fact is established, for summary judgment purposes, that he was denied a change in position or schedule that would accommodate his impairment and disability.

The protected characteristic of Brian Seim in this disability discrimination case was known to and was obvious to the employer. Even if he had not discussed his disabilities with his supervisors, his symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability. *Hedberg v. Indiana Bell Tele. Co.*, 47 F.3d 928, 934 (7th Cir. 1995). In this case Three Eagles Communication had actual knowledge of disabilities even if they had been not immediately obvious, because Brian Seim explained his condition and its effects and had asked for accommodations, a chair and change in work schedule.

Brian Seim was a "qualified" individual with a disability. Brian Seim was able to perform the essential functions of the job with or without reasonable accommodations. 42 U.S.C. § 12111(8). He had 13 years experience in radio. Since he became employed by Three Eagles Communications, he worked continually (as much as his impairment permitted) as on-air personality, talk show host, programmer and voice talent for its radio stations. He did remote

broadcasts and recorded commercials. He satisfies the two-fold inquiry--whether he meets the necessary prerequisites for the job, such as education, experience and training, and whether he can perform the essential job functions with or without reasonable accommodation. *Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1016 (8th Cir. 2000); *Treanor v. MCI Telecommunications Corp.*, 200 F.3d 570, 574-76 (8th Cir. 2000). While he could perform the early morning job, it was very difficult for him to work in the mornings. Despite his impairment, he stuck it out and performed well. He was praised for his performance. His request for a different work schedule that accommodated his impairment was repeatedly denied.

Brian Seim requested reasonable accommodation. He sought a different position or work schedule that would allow him to start work later in the day. He applied for open positions that would have accommodated his request. He even offered to move, at his own expense, to another city where Three Eagles Communications operated radio stations. The ADA requires employers to make reasonable accommodations to allow disabled individuals to perform the essential functions of their positions. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999). A refusal to provide a reasonable accommodation amounts to a constructive demotion. *Fenney v. Dakota, Minnesota & Eastern Railroad Co.*, 327 F.3d 707, 717-18 (8th Cir. 2003). The ADA provides that the "reasonable accommodation" may include job restructuring, part-time or modified work schedules, and reassignment to a vacant position. 42 U.S.C. § 12111(9). 29 C.F.R. § 1630.2(o); *See also Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112-14 (8th Cir. 1995). Job restructuring is one form of reasonable accommodations. *Treanor*, 200 F.3d at 575.; *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 950 (8th Cir. 1999); *Lloyd*, 207 F.3d at 1084; *Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784, 788 (8th Cir. 1998); *Benson*, 62 F.3d at 1112-13 (citing 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(o)(2)(ii)). Reassignment to a vacant position is another reasonable accommodation under the ADA. *Benson*, 62 F.3d at 1114 (citing

42 U.S.C. § 12111(9)(B)); 29 C.F.R. § 1630.2(o)(2)(ii)); *see also Fjellestad*, 188 F.3d at 950-51 (the plaintiff created genuine issue of material fact as to whether employer could have reassigned her to a specific, vacant position). Indeed, the Eighth Circuit has recognized that, in certain circumstances, reassignment to a vacant position may be "necessary" as a reasonable accommodation. *See Cravens*, 214 F.3d at 1018.

Once Brian Seim requested a reasonable accommodation by changing his work schedule to allow him to start work later in the day, his employer was obligated to participate in an interactive process to determine whether it could accommodate the request. Three Eagles Communications operated 3 radio stations in Fort Dodge, Iowa. It operated many other stations in other locations. Radio stations broadcast twenty-four hours a day. Radio employees start work at various times during the day. There were positions in the Fort Dodge Stations that started work late in the morning or in the afternoon. Brian Seim made numerous requests for a different position or work schedule. He satisfied his responsibility to request the provision of a reasonable accommodation. *Miller*, 61 F.3d at 630 (citing 29 C.F.R. § 1630 App., § 1630.9); *Cannice*, 189 F.3d at 727; *accord Buckles v. First Data Resources, Inc.*, 176 F.3d 1098, 1101 (8th Cir. 1999). The evidence establishes other positions and work schedules were possible.

Once Brian Seim made a request for another position or work schedule, the ADA and its implementing regulations require that the parties engage in an "interactive process" to determine what precise accommodations are necessary. *See* 29 C.F.R. § 1630.2(o)(3) & § 1630 App., § 1630.9; *accord Fjellestad*, 188 F.3d at 951. This means that the employer "should first analyze the relevant job and the specific limitations imposed by the disability and then, in consultation with the individual, identify potential effective accommodations." *See Cannice*, 189 F.3d at 727. In essence, the employer and the employee must work together in good faith to help each other determine what accommodation is necessary. *Id.* The failure of an employer to engage in an

interactive process to determine whether reasonable accommodations are possible is *prima facie* evidence that the employer may be acting in bad faith. *See Fjellestad*, 188 F.3d at 952; *Cravens*, 214 F.3d at 1021 In the Eighth Circuit, summary judgment is ordinarily precluded when there is a genuine dispute as to whether the employer acted in good faith and engaged in the interactive process of seeking reasonable accommodations. *Cravens*, 214 F.3d at 1022; *Fjellestad*, 188 F.3d at 953.

## 2. SEXUAL HARASSMENT

Shortly after Brian Seim was employed, Myles Riker was hired by Three Eagles Communications, Inc. as its Operations Manager in charge of all of Three Eagles' Fort Dodge, Iowa radio stations. Riker became Brian Seim's supervisor. He was the "Boss" of the stations.

Shortly after he started with Three Eagles, Brian Seim's vehicle was vandalized twice with anti-gay graffiti. He filed police reports each time. In January of 2009 someone had written, "Go home, gay boy." On the side of the car was written, "Free[1] is a fag." About a week later, the car was vandalized in the radio station's employee parking lot while he was on the air. Written all over his car with mustard was, "Fat boy go home, Iowans don't like gayes". The police told Seim that they were concerned that something physical might happen to him. The police encouraged him to ask his bosses for a staff meeting. He had not been in Iowa long. The only ones who knew him were other employees of Three Eagles Communications. The police thought that if the staff knew that the police were involved, anyone who worked there would likely stop the harassment.

Seim went to management with his concerns. Previously, he had only spoken to Riker on the phone. This was to be his first face-to-face meeting with Myles Riker. (They worked out of different buildings.) Seim reported the vandalism and requested a staff meeting. Riker

responded, "There would be no meeting." Riker asked if Seim had any suspicions as who did it. While Seim knew that both Zimmerman and Riker lived near him and he suspected that both might be the culprits, he only mentioned his suspicions regarding Zimmerman. Riker responded, "If you F'ing mention this in my building, if I even hear a word of it, Brian, you're done." Out of fear of losing his job, Seim did not mention it to anyone else or pursue a staff meeting over the vandalism.

During the course of that meeting Seim informed Riker that he had an autoimmune disorder, a blood disease (Graves' Disease). Riker responded by asking if he had AIDS. Seim was shocked by the question. He replied that he didn't have AIDS and asked why it was relevant. Riker responded that he didn't care whether or not Seim was gay. Seim was upset and insulted. He stood up to leave and Riker told him to "Sit the F___ down." He told Seim, "Be a man." That ended the meeting. From their first encounter Riker was questioning Seim's sexuality, whether he had AIDS or was gay and told him to "be a man". These statements all involve sexual orientation and sexual stereotyping.

The following Friday, Seim met with Bill Wells, another supervisor but subordinate to Riker. Seim explained that he had Graves' Disease. He complained about Riker's questions and comments. Wells made it clear that what Riker says goes. Wells told Seim that Riker is the boss and you are to do what you are told. Seim took this response as a reprimand for his complaint over Riker's comments.

Brian Seim had disclosed his Graves' Disease to Zimmerman, Wells, Riker and Murley. He explained that he needed to start work later in the day. He explained that he could not stand for any length of time. Riker's response that he should "man up". Two days later a fellow employee loaned him a chair.

---

[1]  Brian "Free" was Brian Seim's on air name.

**8**

The relationship with Riker went from bad to worse.  During a staff meeting, just after the new women's bathroom was completed in the new building, Riker told everyone, "Let's send Brian to check it out."  This type of harassment, based on Riker's opinion that Seim did not conform to the sexual stereotype expected of him, continued throughout his employment.  Riker was apparently perceived that Seim was a homosexual and singled him out for comments and actions constituting illegal harassment.

When the first gay marriage took place in Iowa, Seim suggested that the couple be interviewed for a radio program.  It was national news. Seim asked Duane Murley about doing an interview with them.  He was told he had to discuss it with Riker.  Seim met with Riker and explained that it was national news.  Fox, CBS and CNN were on the story.  They were here in Iowa.  Seim wanted to get an interview on talk radio on KWMT.  Riker responded, "Absolutely not."  Riker hit his desk and said that he knew that Seim was going to ask about it, "It's perverted."

Before long other employees began asking Seim if he had AIDS.  The only person who had ever even raised that issue was Riker.  Seim believes that Riker spread the rumor throughout the stations. Two employees of the radio stations reported to Seim that Riker had asked them if Seim was "light in the loafers".

One of the stations, 99X, that played hip hop urban music, was considering a change of format because it was losing money.  On his own initiative, Seim spent several days putting together a written proposal with his philosophy for changing the format to one that would appeal to office workers and background music for offices.  Gary Buchanan, the President of Three Eagles Communications, Inc. thought it was a great idea.  Riker shot down the proposal telling Seim, "Pansy music wouldn't work in Fort Dodge."  After Seim was fired the format was changed to the format that he suggested and the station is now called "Sunny".

In mid May, 2009, when Seim was eating lunch in the break room, Myles Riker walked by and with his left hand pinched Seim's breast. Then he told Seim, "I [Seim] would make some man very happy someday." (One of the complications of Graves' Disease is breast enlargement.) The touching, combined with the comment, clearly had a sexual basis.

Throughout his period of employment with Three Eagles, Seim sought a change of position or work schedule that would allow him to start work later in the day when the side effects from his medication had worn off. On each occasion Riker made the decision to deny any change. Seim should "be a man." Seim believes that Riker was motivated by his discriminatory attitude based on his perception that Seim was gay. Each time he was denied an opportunity, Riker would say that the way out of this was take a job with another radio station. Riker even withheld payment for Seim's work on remote broadcasts.

On their very last meeting, two hours before he was terminated, Riker told Seim that he knew that he was a "pansy" the day he saw me. As Seim left the meeting, Riker said that he hoped that you cure your AIDS.

After he was fired and was in the hospital, four of the employees told him about a staff meeting when Mike Devine, another employee of Three Eagles, had worn an "anti-gay" shirt to the meeting. Riker told everyone at the meeting, "It's a good thing Free isn't here. He'd be moaning like a little girl."

Three Eagles Communications made no investigation into the vandalism. Myles Riker, the Operations Manager of the station, created a hostile work environment based on his sex based animus against Brian Seim. Riker, Seim's supervisor and the person who ran the stations, was the primary instigator. When Seim's car was vandalized in the employee parking lot, Riker refused to call a staff meeting to discuss the problem and to prevent future harassment. He refused to undertake any investigation. When Seim objected to the homosexual comments, he

was rebuffed. Myles Riker referred to Seim as a "pansy" or "a little girl". He commented to his subordinates about Seim having AIDS and being "light in the loafers". Riker sexually molested Seim, squeezing his breast and immediately remarking that Seim "would make some man very happy". When other employees demonstrated anti-gay attitudes, nothing was done and no one was reprimanded. Riker ran the stations and no one could challenge him. He was "the Boss". He instigated the sexual harassment. Seim's complaints went unheeded and the harassment continued throughout his employment with Three Eagles Communications, Inc.

Iowa prohibits discrimination on the basis of sexual orientation or gender identity. Section 216.6(1)(a) states,

> It shall be an unfair or discriminatory practice for any:
>
> a. Person to refuse to hire, accept, register, classify, or refer for employment, to discharge any employee, or to otherwise discriminate in employment against any applicant for employment or any employee because of the age, race, creed, color, sex, sexual orientation[2], gender identity, national origin, religion, or disability of such applicant or employee, unless based upon the nature of the occupation. If a person with a disability is qualified to perform a particular occupation, by reason of training or experience, the nature of that occupation shall not be the basis for exception to the unfair or discriminating practices prohibited by this subsection.

Federal law does not contain that clear prohibition. However, federal courts have recognized that a man can successfully bring a Title VII claim for sexual harassment in employment based on acts by other men. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 140 L.Ed.2d 201, 118 S.Ct. 998 (1998). Similarly, in *Quick v. Donaldson*, 90 F.3d 1372 (8th Cir. 1996) the Eighth Circuit stated that under Title VII it was sufficient to show that hostile behavior of a sexual nature was targeted primarily at men. In *Schmedding v. Tnemec Co., Inc.*,

---

[2] "Sexual orientation" means actual or perceived heterosexuality, homosexuality, or bisexuality. Section 216.2(14), Code of Iowa (2011).

187 F.3d 862 (8th Cir. 1999) the court held that the plaintiff had stated a Title VII claim where the harassment included rumors that falsely labeled him as homosexual in an effort to debase his masculinity. These decisions follow *Price Waterhouse v. Hopkins,* 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989) which had held that discriminatory conduct toward an employee for failure to conform to gender stereotypes is impermissible under Title VII.

Even where the plaintiff makes claims that he is being discriminated against and harassed because he is believed to be a homosexual, the claim can fall within the protection of Title VII. *Schmedding v. Tnemec Co., Inc*., 187 F.3d 862 (1999). Schmedding claimed that he was taunted as being homosexual and that rumors were spread regarding his perceived sexual preference. The Eighth Circuit held that

> Having reviewed the complaint, and keeping in mind the liberal standards for pleading under the federal rules, we think that Schmedding states a cognizable claim under Title VII. Although the complaint is not a model of clarity, we think Schmedding has alleged sufficient facts under Count I to state a claim that he was being harassed "because of sex." Count I alleges among other things that Schmedding was: patted on the buttocks; asked to perform sexual acts; given derogatory notes referring to his anatomy; called names such as "homo" and "jerk off"; and was subject to the exhibition of sexually inappropriate behavior by others including unbuttoning of clothing, scratching of crotches and buttocks; and humping the door frame to Schmedding's office. We do not think that, simply because some of the harassment alleged by Schmedding includes taunts of being homosexual or other epithets connoting homosexuality, the complaint is thereby transformed from one alleging harassment based on sex to one alleging harassment based on sexual orientation. We note that in *Oncale* and *Quick,* both of which dealt with claims of same-sex harassment by heterosexual males against a heterosexual male plaintiff, the alleged harassment included the fact that plaintiff was taunted as being a homosexual. *See Oncale,* 523 U.S. at 77, 118 S.Ct. 998; *Quick,* 90 F.3d at 1374.4 Although Schmedding's use of the phrase "perceived sexual preference" may have been somewhat misleading, we conclude that, in light of the confusion over the meaning of that phrase, and Schmedding's willingness to amend the complaint so as to delete it, the best recourse is to remand the

case to the district court with instructions that plaintiff be allowed to amend his complaint and proceed with the case.

The Ninth Circuit has decided that even transsexual persons are protected from sex discrimination under Title VII and other sex discrimination statutes. *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000). The court relied upon the *Price Waterhouse* ruling:

> What matters, for purposes of this part of the *Price Waterhouse* analysis, is that in the mind of the perpetrator the discrimination is related to the sex of the victim: here, for example, the perpetrator's actions stem from the fact that he believed that the victim was a man who 'failed to act like' one. . . . Discrimination because one fails to act in the way expected of a man or woman is forbidden under Title VII.

Other federal courts have followed *Price Waterhouse* in cases where employees were discriminated against and harassed for failure to conform to stereotypical notions of how a man or a woman should act. *See, e.g., Nichols v. Azteca Restaurant Enterprises*, 256 F.3d 864, 874-75 (9th Cir. 2001) (perception that the plaintiff was effeminate is harassment because of sex in violation of Title VII and the Washington state law); *Coca Cola Bottling Co.*, 260 F.3d 257 (3rd Cir. 2001) (claim of sex discrimination permitted by showing that the harasser's conduct was motivated by a belief that the victim did not conform to gender stereotypes); *Simonton v. Runyon*, 232 F.3d 33 (2nd Cir. 2000) (discrimination under Title VII may be based on a failure to conform to gender norms); *Spearman v. Ford Motor Co.*, 231 F.3d 1080 (7th Cir. 2000) (sex stereotyping may constitute evidence of sex discrimination); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261 n.4 (1st Cir. 1999.

### 3. HOSTILE WORKPLACE

The Iowa Civil Rights Act, § 216.6, and Title VII are violated when workplace harassment by a supervisor, based on sex, creates a hostile work environment. *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66-67, 106 S.Ct. 2399, 2404-05, 91

L.Ed.2d 49 (1986). To be actionable, the sexual harassment must have been "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405). A single offensive utterance or exposure to distasteful conduct does not rise to the level of a Title VII violation. *See Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405; *Lam v. Curators of the Univ. of Mo.,* 122 F.3d 654, 656-57 (8th Cir.1997). The plaintiff must show both that the offending conduct created an objectively hostile environment and that he subjectively perceived his working conditions as abusive. *See Harris,* 510 U.S. at 21-22, 114 S.Ct. at 370-71.

Evidence of conduct that creates a workplace permeated with "discriminatory intimidation, ridicule, and insult" establishes a hostile environment claim. *Harris* at 21, 114 S.Ct. at 370. Not all unpleasant or abusive behavior in the workplace is actionable. The plaintiff must show that the conduct was discriminatory in nature and that he was singled out for such treatment on the basis of his membership in a protected category under the statutes. *Kopp v. Samaritan Health Sys., Inc.,* 13 F.3d 264, 269 (8th Cir.1993) (hostile environment plaintiff must show that harassment was based on sex); *see also* 42 U.S.C. § 2000e-2(a)(1).

In conducting its fact-based inquiry into the severity and pervasiveness of the conduct and into whether it was based on sex, the jury looks at all the circumstances supported by credible evidence. *Harris,* 510 U.S. at 23, 114 S.Ct. at 371. In his concurring opinion Justice Scalia stated that since Congress set no clear standard defining a hostile environment, it must be left to "virtually unguided juries" to decide whether particular conduct is "egregious enough" to merit an award of damages. *Id.* at 24, 114 S.Ct. at 371. There is no bright line between sexual harassment and merely unpleasant conduct so a jury's decision must generally stand unless there is trial error. *Baskerville v. Culligan Int'l Co.,*50 F.3d 428, 431 (7th Cir.1995).

14

To prove a sexual harassment claim of hostile work environment, Seim must show:

1.  he was a member of a protected group.  *Men can be the subject of harassment on the basis of sex and are protected under Iowa law is harassment is based on sexual orientation or the perception of sexual orientation.*

2.  he was subject to unwelcome harassment.  *Brian Seim was continually harassed, his vehicle vandalized and his body groped by his supervisor.*

3.  the harassment was based on sex.  *Myles Riker continually made references to AIDS, being gay, light in the loafers, a pansy, not a man, and that someday he would make a man very happy (sexually).*

4.  that it "affected a term, condition, or privilege of employment." *Transfers, change in work schedule and promotions were denied.  Pay for remote broadcasts were unreasonably delayed.  He was fired.*

5.  that his employer knew or should have known of the harassment and failed to take appropriate remedial action.  *Seim complained to Riker, to human resources and other supervisors over his treatment.  He offered to resign in the hope that someone would pay attention to his complaints. After he withdrew his resignation, he was fired.  No investigation was ever made.  No effort was made to stop the harassment.  The "Boss" was behind the harassment!*

A work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it "into a series of discrete incidents." *Burns v. McGregor Elec. Indus., Inc.,* 955 F.2d 559, 564 (8th Cir.1992).  Exposure to harassing conduct need not have been continuous in order to have been pervasive. *Smith v. St. Louis Univ.,* 109 F.3d 1261, 1264 (8th Cir.1997).

Once an employee complains to his employer about sexual harassment by a coworker, the employer is on notice and must take proper remedial action to avoid liability under Title VII. *Davis v. Tri-State Mack Distrib., Inc.,* 981 F.2d 340, 343 (8th Cir.1992).  In addition to conducting an investigation, the employer must take "prompt remedial action reasonably calculated to end the harassment." *Davis v. Tri-State Mack Distrib., Inc.,* 981 F.2d 340, 343 (8th Cir.1992).  Brian Seim complained to his supervisors.  No action was taken, probably because his supervisor was the perpetrator.

On this Motion for Summary Judgment, the facts are all viewed in Seim's favor and the statements in his affidavit are presumed to be true. At this stage, the controlling issue is whether or not there exists a genuine issue of fact regarding *any* discriminatory motive. A genuine issue of fact regarding unlawful employment discrimination may exist even though the plaintiff is unable to directly disprove the defendant's proffered reason for the adverse employment action. *O'Bryan v. KTIV Television*, 64 F.3d 1188, 1192 (8th Cir. 1995)

> [T]he standard for plaintiff to survive summary judgment required only that plaintiff adduce enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence did not directly contradict or disprove defendant's articulated reasons for its actions."). As we have often stated, the focus of inquiry at the summary judgment stage "always remains on the ultimate question of law: whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of [the protected characteristic]..

Davenport, 30 F.3d 940, 945 (8th Cir. 1994). n.8.

Brian Seim can successfully resist the Motion for Summary Judgment because the evidence, direct or circumstantial, establishes a genuine issue of fact regarding sexual harassment and discrimination and the existence of an unlawful motivation for the adverse employment actions even though he may not be able to create genuine doubt as to the truthfulness of a different, yet lawful, motivation asserted by Three Eagles Communications, Inc.

### 4. RETALIATION

The Title VII anti-retaliation provision has two clauses, making it "an unlawful employment practice for an employer to discriminate against any of his employees ... [1] because he has opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Brian

**16**

Seim opposed the discrimination directed towards him. He complained about failure to accommodate his disability by not allowing him to change his work schedule to start later in the day, after the side effects of the medication required to treat his Graves' Disease had diminished. That claim arises under the ADA and the Iowa Civil Rights Act. He objected to sexual harassment, violations of Title VII and the Iowa Civil Rights Act. The complaints are detailed in other portions of this brief. Seim complained to Bill Wells, General Manager, about Riker's inquiry about AIDS and homosexuality. He complained to them both over the vandalism to his vehicles. Riker continued to create a harassing work place for Seim on the basis of sex.

Certainly Brian Seim had other complaints over his treatment by Riker. This does not preclude him from seeking redress for the sexual harassment and the failure to accommodate his disability. On May 4, 2009 Seim made written complaint in an email to Cindy Harris, Human Relations Manager. He received no response. Eventually things became so difficult for Seim that on May 11, 2009, he sent an email in which he complained about the lack of response to his frequent requests for a change in his work schedule and tendered his resignation. In that email he complained about being denied work in the afternoons in order to accommodate his illness. (Def's App. p. 53.) After Duane Murley spoke to him, Seim withdrew his resignation. He sent his complaints to Cindy Harris again on May 12, 2009. In that lengthy message he expressed his frustration with Riker. He complained that he had reported harassment to Riker and Wells but nothing happened. (Def's App. p. 57.) He complained about having his vehicle vandalized with references to "Gay Boy" yet nothing was done. (Def's App. p. 61.) He complained about being denied accommodation by reassignment to an afternoon schedule. (Def's App. p. 63.)   He received no reply except having his employment terminated on May 19, 2009.

To establish a claim of retaliation, the plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer took or engaged in a materially adverse action, and (3) a

causal connection existed between the protected activity and the materially adverse action. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 2414-15 (2006); *see, e.g., Higgins v. Gonzales*, 481 F.3d 578, 589 (8th Cir. 2007). An action is "materially adverse" if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *Burlington,* 548 U.S. at 68; *Vajdl v. Mesabi Academy of Kidspeace, Inc.*, 484 F.3d 546, 552 (8th Cir. 2007). Stated another way, the claim requires the plaintiff to show (1) he engaged in a protected activity; (2) a reasonable person would have perceived the alleged retaliatory action materially adverse; and (3) this adverse action was causally linked to his protected conduct. *Higgins v. Gonzales,* 481 F.3d 578, 589 (8th Cir.2007). The filing of incident reports (and grievances) and Charges of Discrimination are protected activities. *Ogden v. Wax Works, Inc.,* 214 F.3d 999, 1007 (8th Cir.2000).

Brian Seim "opposed" the sexual harassment and the denial of reasonable accommodation for his disability. That is a sufficient opposition to trigger the anti-retaliation remedies under federal and state law. In *Crawford v. Metropolitan Gov. of Nashville and Davidson County,* 129 S.Ct. 846, 172 L.Ed.2d 650 (2009) addressed what was meant by "opposition":

> The term "oppose," being left undefined by the statute, carries its ordinary meaning, *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979): "to resist or antagonize ...; to contend against; to confront; resist; withstand," Webster's New International Dictionary 1710 (2d ed.1958). Although these actions entail varying expenditures of energy, "RESIST frequently implies more active striving than OPPOSE." *Ibid.;* see also Random House Dictionary of the English Language 1359 (2d ed.1987) (defining "oppose" as "to be hostile or adverse to, as in opinion").

Crawford had reported instances of sexual harassment in the course of investigation. The court held that the statement Crawford says she gave was covered by the opposition clause, as an

ostensibly disapproving account of sexually obnoxious behavior toward her by a fellow employee. Under that standard, Seim's complaints are legally protected activities in opposition to violations to civil rights laws. Seim's written complaints to his supervisors and the human relations department were in the period from May 4, 2009 – May 12, 2009. He was fired on May 19, 2009 by Riker, the very person most responsible for the violations of his civil rights.

The opposition to violations of civil rights or ADA discrimination must be a determining or motivating factor in the employer's decision. The close temporal proximity between the complaints and the termination of his employment is strong evidence of a causal connection between these events and what motivated his termination. "An inference of a causal connection between a charge of discrimination and termination can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation." *Peterson v. Scott County,* 406 F.3d 515, 524 (8th Cir.2005) [citations omitted]. The court held that the plaintiff's termination two weeks after the protected activity was "close enough to establish causation in a prima facie case." *Id.* at 525; *Smith v. Allen Health Systems, Inc.,* 302 F.3d 827, 833 (8th Cir.2002) (holding that two weeks between the protected activity and termination was enough to establish causation); *Wallace v. DTG Operations, Inc.,* 442 F.3d 1112, 1120 (8th Cir.2006) (four weeks between the protected activity and the plaintiff's termination to "strongly [support] an inference of causation for the purpose of the prima facie case."

Termination of employment is clearly a materially adverse employment action. To qualify as unlawful retaliation, the employer must have taken a "materially adverse" action. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405,2414-15 (2006). To be "materially adverse," the plaintiff must show that a reasonable employee in plaintiff's position might well have been "dissuaded" from filing or supporting a charge of discrimination.

*Id.* at 68. No employment action can be more material than termination of employment.

## CONCLUSION

There are sufficient facts in the record to support Brian Seim's claims of discrimination and retaliation. Summary judgment should be denied.

                JOHNSON, KRAMER, GOOD, MULHOLLAND,
                COCHRANE, & DRISCOLL, P.L.C.

                By /s/ Stuart J. Cochrane
                   Stuart J. Cochrane    AT0001504
                   809 Central Ave., Suite 600
                   Fort Dodge, IA 50501
                   Telephone: (515) 573-2181
                   Facsimile: (515) 573-2548
                   E-mail: stu.cochrane@johnsonlawia.com

                ATTORNEYS FOR PLAINTIFF

Original filed.
Copy to:

Patrick J. Barrett
Fraser Stryker PC LLO
500 Energy Plaza
409 South 17th Street
Omaha, NE 68102-2663

| PROOF OF SERVICE |
|---|
| The undersigned certifies that the foregoing instrument was served upon all parties to the above cause by serving each of the attorneys of record herein at their respective addresses disclosed in the pleadings on the 10th day of February, 2011, by: |
| _____ U.S. Mail      _____ Facsimile <br> _____ Hand-delivery    __X__ Other: ECF Filing |
| Signature: /s/ Stuart J. Cochrane |